here. You hear you hear you. The United States Court of Appeals for the 11th Circuit is now open, according to law. God save the United States and dishonorable court. Good morning. My name is Beverly Martin, and we wish we could be together with you in person this morning. But that time has not yet arrived. I, for one, and delighted to be here with my colleagues, Judge Newsome and Judge Branch. And we're looking forward to hearing your cases. For those of you who are not familiar with our traffic light system for the timekeeping, the countdown on the clock will be in green until two minutes before your time is, is to expire, and then it'll turn yellow, and then red. And we count on our advocates to wind things up when the when the clock turns red. With that, unless I'm forgetting something, I think we're ready for the first case of the day. And that is Miss Luke versus the University Health Services, Inc. So I'll call that case, and we'll be happy to hear from you, Miss Luke. Good morning. May I, may it please the court. My name is Ramonica Luke. I'll be representing myself versus University Health Services. The basis of my argument is to show that all eight comparators were simply situated based on a comparative evidence analysis of the pretest stage in the McDonnell Douglas framework. In a pretest stage of the McDonnell Douglas test, the district court ruled to prove pretest plaintiff was to put forth evidence that the employer subjectively believed that the comparators in question were simply situated and treated them differently. This subjective belief standard is the wrong analysis to determine a proper comparator in the pretest stage. Discrimination is about actual knowledge and real intent, not constructive knowledge and assumed intent or speculation. The Supreme Court held that actual knowledge means when a person is actually aware of the relevant facts, not when it should be. Even if a similarly situated comparator exists, the comparator's actions are relevant only if the plaintiff shows that a decision maker knew of the comparators prior similar acts and did not discipline the comparator. The Supreme Court concluded that it is especially relevant to show pretest would be evidence that white employees involved in acts against petitioner of comparable seriousness to the stall and were nevertheless retained or rehired. In this case, Vicki Ford was the timekeeper and supervisor for each comparator who violated the attendance policy. She was also a decision maker who recommended planning for termination based on attendance. Some of the God, one of the guidelines, one of the, um, the excuse me, one one thing that would have made a comparator similarly situated in the pretest stage of the McDonnell Douglas is if the employer subjected plaintiff and comparators to different employment policies. And in this case, all employees were subjected to the same attendance policy and under the same guidelines. This is Luke. This is I ask you a quick question. Am I coming through? Yes, you are. So who exactly are the comparators that you're appointing us to? Because your opponent says that you don't really have good comparators because the ones you point to or either were either being supervised by someone else who had a different kind of grace period policy or if supervised by the same person had a different disciplinary history or the like. So who exactly are the comparators that you're really situated? The comparators. Do you want me to name name the individual name? Just explain to me why the comparators that you're pointing to are in fact similarly situated. Maybe we could do this by process of elimination. Are there comparators you've pointed to who were being supervised by someone else? No, all comparators were supervised by Vicky Ford. All comparators. I have at least five years of attendance records for all comparators. Um, all comparators were under the same guidelines, the attendance policy in which I was also terminated for. And also, um, what was the other guideline? Um, I guess let me ask you this. Like the same disciplinary history. Were they subject to co worker complaints? Um, were they suspected of falsifying time records? I mean, those are the kind of the, you know, some of the relevant criteria that we have in this case. They were not. Um, um, they were not. Um, no, they were not. Okay. Oh, that's thank you. You can go ahead. Thank you so much. Okay. As far as that is concerned, um, the department's dissimilar treatment of plaintiff in her comparators because supervisor subjected belief that she falsified time records and employee complained of plaintiff tardiness. Vicky Ford had no reason to believe that comparators the reason the reason that the defendant stated that, um, plaintiff plaintiff was dissimilarly situated was because, um, they stated that Vicky Ford had no reason to believe that the comparators were falsifying their time adjustment sheets or dishonest about dishonest with their time and attendance records. The evidence used in this decision was a declaration statement submitted by before describing her subjective belief about secondary information. And according to the federal rule, Civil Procedure 56, the court does not consider statements purported to offer feelings or opinions of third parties on summary judgment because the definite lot lacks personal knowledge. I'm sorry. Do you challenge admissibility boards declaration below before the trial court? No, I did not. Okay, so you're raising it for the first time before us. Yes. Furthermore, supervisor's acquisitions were pretextual and human resources did not recommend recommendation for termination due to lack of evidence. So, um, Vicky Ford, um, recommended Turner recommended planning for termination for falsified, um, falsifying documents. She sent the recommendation to human resources, human resources, denied the terminate, um, the recommendation for termination due to lack of evidence. Once they did not, the termination due to lack of evidence, they sent it back to Vicky Ford and Vicky Ford recommended plaintiff for termination based on, um, a mispunch that occurred on December 31st, 2016 for a final incident. Yeah. Miss Luke, I want to make sure I understand your challenge to what the district court did regarding the comparators that you've put forth. The district court assumed that you had made out a prima facie case. Um, and then the district court again considered the comparator evidence, um, at the pretext stage. So can you talk me through what you are alleging that the district court did wrong regarding your comparators? The district court. One thing that additional court did wrong. They applied the subjective belief, um, standard and, um, they stated that the reason why I was dissimilarly situated from my comparators was because Vicky Ford believed that I falsified time records. But, um, university hospital only offered one reason why I was terminated and that was due to attendance. So during the process of termination, Vicky Ford wrote the recommendation for falsifying time records. But you want to doing when she wrote the recommendation for falsifying time records, they just approved. They didn't approve that that recommendation because due to lack of evidence, so she had to once they disapprove the recommendation for termination, they she recommended me for termination due to attendance. Okay. So I also want to go with some of the guidelines for, um, some of the comparators were under and, um, one of the guidelines is that all comparators in the laboratory were subjected to, um, was not subjected to a seven minute grace period. So, um, any time, any time over one minute was considered late. And also all comparators were required to clock in. And if you could look at some of the, um, the comparators. I had one comparator from 2000 and 17 2000, excuse me, 2015 to 2017. She had 231 parties and 48 mispunches. And she was, um, she was written up. She was on a final written warning. Um, I also have a, um, a comparator who from 2015 to 2017, um, she, she had 193 parties and eight mispunches. Also, she was also on final written warning. Um, prior to my termination, also have a comparator who, um, from 2000 January 1st, 2015 to January 1st, 2017, she had 153 parties and 11 mispunches and she was never written up for, um, for attendance issues. Another comparator she from 2015 to 2017, she had 90 parties and eight mispunches. She was never, never written up or terminated for attendance issues as well. I also have a another, um, comparator who was from January 1st, 2015 to 2017. She had 34 parties and 21 mispunches and she was never written up for attendance issues. Also have another comparator from January 1st, 2015 to January 1st, 2017. She had 21 mispunches and she was not written up for any attendance issues. I have another comparator who, um, from January 1st, 2015 to January 1st, 2017, she had 85 parties and 21 mispunches and she was never written up or terminated for, for attendance issues. When plaintiff was terminated for attendance, she had, it was, um, documented in the, in, um, doc, which was document 54 to the, um, letter that was sent to the Georgia Department of Labor. She had 31 parties, one unexcused absence and 11 mispunches. Miss Luke, how do you address the comparator, the similar situated persons that, um, uh, University Health put forward that there were, I think, two employees who were white, who were terminated for tardiness and absences? The only, um, employee that was terminated for, um, tardies was Angela Thomason. And, um, and Angela Thomason, she would have fell off at the first stage of the, um, the preemie, preemie Fossey stage because she only had one year of employment history. Um, also it was stipulated that, um, the person who terminated Angela Thomason was Christopher Westbrook, who was the human resources director. All right. Um, Miss Luke, you can see the clocks turned to red. You've got your, uh, rebuttal. So we'll hear from you again. And thank you for your presentation. Thank you. Um, Mr. Martin. Good morning, Your Honor. Good morning. May it please the court. My name is Jonathan Martin, and I represent University Health Services, Inc. The employer in this matter. We respectfully ask that the court affirm the ruling of the United States District Court for the Southern District of Georgia that University Health Systems did not discriminate against plaintiff for Monica Luke when it terminated her employment due to attendance. We do so for three reasons. First, Miss Luke was uniquely situated. There are no other employer employees reporting to Vicki Ford, whose co workers complained about their tardiness, and there are no other employees who Vicki Ford suspected of time card falsification. Second, Miss Luke worked for Miss Ford for years and Miss Ford Council Miss Luke regarding her attendance issues for years. Miss Ford had numerous opportunities to terminate Miss Luke for her attendance in accordance with hospital policy, but she always gave Miss Luke another chance, including a second final written warning within 12 months in 2015 when Miss Ford could have terminated Miss Luke Miss Ford suspicion that Miss Luke falsified her time card adjustment changed everything. Third, Vita Mason and Human Resources, who is also African American, conducted an independent investigation into the recommendation for termination for attendance and time card falsification. Miss Mason was unable to substantiate the time card falsification allegations, but Miss Mason approved the termination based on Miss Luke's excessive tardiness. Following her third final written warning, there is no dispute about the facts. The only dispute in this case is about the law. This litigation started when Vicki Ford, where Monica Luke supervisor received an email from Amita Simmons, an African American co worker of plaintiffs complaining about Miss Luke. The email, which was sent at 6 11 p.m. On December the 31st 2016 stated, I have been here since four a.m. And I'm still here where Monica is continuously late, and it is not fair to me to be here all day and practically all night. I need rest to the next day. Miss Simmons elaborated. It is not fair to me that this continuous tardiness being left on my back. No consideration. I'm here 14 hours, and she was late, but she is always late. This set in motion the termination of plaintiff appellant. We're Monica Luke for her entire career as an employee of University Hospital, where Monica Luke was late for work time and time again. For her attendance problems, plaintiff received a total of seven warnings, including two final written warning and a second final written warning. Within 12 months, Miss Luke's final or last final written warning, which was issued on September the 29th 2016 provided. This has been a habitual and serious problem, and improvement has not been seen. Therefore, the next occurrence of a tardy will result in immediate termination. According to Miss Luke's attendance records, she was tardy on several occasions thereafter. Specifically on November the 21st, she was late due to personal reasons, but Miss Ford did not terminate her on December the 24th. According to her time records, Miss Luke was late for with no reason again. She was not terminated. And finally, on December the 29th, Miss Luke was late again with no reason again. Miss Ford did not take any action. It was not until Miss Simmons complained about plaintiff and her tardiness on December the 31st that Miss Ford began to review both Miss Luke's actual attendance records as well as her time card adjustment. Ford concluded that Miss Luke not only violated her final written warning, but also that she adjustment, which is done by employees who failed to clock in, indicated that Miss Luke arrived at six p.m. However, Miss Ford already had an email from a co worker saying that she was not present at 6 11. And appellants badge history did not have her entering her work section until 6 12. Accordingly, Miss Ford initiated discharge as follows. With the falsification of record and history of write ups concerning attendance and punctuality, we are recommending termination over Monica Luke. Significantly, um, Vicky Ford initiated the termination of a Caucasian employee, Angela Thomason, for poor attendance around the same time frame. Like appellant, Angela Thomason was tardy on multiple occasions after receiving a final written warning, and she was also on a second final written warning within 12 months. Unlike Miss Luke, Miss Thomason was terminated for being tardy merely two times following her final written warning. Miss Luke, in contrast, had four unexcused absences or tardies prior to the initiation of termination. And most importantly, her termination was predicated on the time card adjustment falsification. In addition to her tardiness, Mr Martin, you have pointed to the time card falsification suspicion. But you also indicated or it's certainly discussed in the briefs that the investigation into the falsification said there was insufficient evidence of falsification. How do we reconcile that? Well, your honor, here's I guess I would say that that goes to show that Miss Luke was treated fairly. It's a two part process. The individual supervisor does not have the unilateral authority to terminate employee. They make a termination recommendation and then human resources conducts in an independent investigation. Miss Mason and her deposition stated that she was not willing to recommend termination based on the time card falsification allegation because she did not find and I believe her words were something to the effect of. She didn't find enough evidence to substantiate it. She also didn't find enough evidence to deny it. However, based on the final written warning and Miss Mason's review of appellants attendance history, she did recommend the termination based on her attendance. So I don't believe that is inconsistent, your honor. In fact, if anything, we would submit to the court that it is consistent that Miss Luke was treated fairly because the allegation made by the supervisor, um, was ultimately vetted through their own internal administrative processes. Mr Martin, you mentioned Angela Thomason. As I understand, and I'm Miss Luke can certainly correct me if I'm saying this wrong, but I think the distinction she made was that Angela Thomason was still in somewhat of a probationary period. She was a much newer employee than than this Luke. Um, so there's that distinction. And I wanted to ask you to address that. But also, you know, the list of comparators that Miss Thompson, um, some that had, you know, thousands of tardies and we're not, um, not terminated. What? What is your response to that? Yes, your honor. My suspicion is that if, for example, Miss Thomason was a newer, you know, employee, um, then, you know, honestly, I think that that goes in the employer's favor, not Miss Luke's favor, because one would think that the supervisor would be less strict with a new employee than with an employee who'd been there for a long time, who had, you know, seven disciplinary actions or seven, you know, written, uh, corrective actions. And so, I mean, I think ultimately, you know, what we're submitting to the court is that Miss Thomason was held to a higher standard than Miss Luke. Now, insofar as the other folks are concerned, I think it's clear from the record, uh, that there were a number of people who had abysmal attendance, you know, including Miss Luke. If, if you look at the record, um, prior to her, uh, final written warning in September of 2016, she had 35 instances of being tardy. Um, the, the record itself, and this is a document, 39 page 169, um, provides for, uh, termination after 10 instances. It after five, there's a written, two additional as a final written, and then another instance of being tardy results in termination. And so there are a number of people who are the beneficiary of, uh, you know, of management who was tolerant, including Miss Luke, who also had, um, a... But I mean, that's exactly her point. You know, they were tolerant. She says they were tolerant of, of the Caucasian employees, and now she's out of a job. So, I mean, the fact that it was a lax, um, system of discipline and that other people had an abysmal, I think your word was abysmal, um, you know, tardiness records. That's, that's exactly the point she's making. It's, this was allowed to go. Your Honor, we would respectfully submit to the court that the distinguishing characteristic with Ramonica Luke is she may have continued to have, um, you know, tardiness, but for the fact that her coworker went and complained to management, and that triggered everything. As you can see from her, from her attendance records, she had, you know, three instances of being tardy after her final written warning. And if Miss Ford was out to get her based on her race, which is her contention, then she had numerous opportunities to do so. It really wasn't until Amita Simmons brought Miss Luke's attendance to the forefront with her scathing email about being treated unfairly that the supervisor began to investigate not only Miss Luke's tardiness, but also had the suspicion that she had falsified her time card because the adjustment did not reflect what the supervisor understood from reviewing the time card, the entry as well as reviewing the email from Miss Simmons. I have an orchestra of leaf blowers outside my window. I might have to mute myself. No, I understand. Your Honor. Do you have any other questions? I'm I'm good. Thank you. Um, about my colleagues. Thank you, Your Honor. Um, as as I mentioned, Miss Ford did not have the unilateral authority to discharge Miss Luke. Rather, she had to submit the recommendation to human resources. Upon receiving the recommendation of termination, Vida Mason, who's an African American human resources manager, conducted an independent review of the allegations and also reviewed plaintiff's employment file. As Judge Martin mentioned, uh, Miss Mason was unable to conclude to her satisfaction that Miss Luke, in fact, falsified her time card. But Miss Mason was able to conclude that the continued violation was a violent was was, um, invite. The continued tardiness was in violation of the hospital's attendance policy. As we mentioned, it is our position that Miss Luke has no comparators. The individuals that she mentions are not similarly situated in all material respects as set forth in Lewis versus city of Union City because, uh, there is a key distinction, and the key distinction is this. None of the comparators that Miss Luke sets forth either had another employee who complained to management about their attendance, and none of those individuals were suspected of time card falsification or time card fraud. We submit as a matter of law that makes plaintiff's proposed comparators inact inapplicable. As I mentioned in the court's opinion in Lewis versus city of Union City is instructive and evaluating comparators. In that opinion, the court provided practitioners guidance. What it means to be similarly situated, and there are four criteria. Number one. They must have engaged in the same basic conduct or misconduct is plaintiff. Number two. They must be subject to the same policy or guideline. Number three. They must have the same supervisor and number four. They must share the plaintiff's employment or disciplinary history. It is our position that Miss Luke is unique because none of her alleged comparators engaged in the same conduct in that none of them were suspected of engaging in time card falsification, and none of them share the same disciplinary history as plaintiff in that none of them had co workers who complained. We submit that that distinguishes Miss Luke. In other words, as Lewis pointed out, this is a classic case of treating different cases differently, which is not discriminatory. But there's more. Even if plaintiff's comparative evidence was sufficient for a prime aphasia case, which the district court assumed, uh, it is insufficient to show pretext. Your honor, I noticed that my time is up. It is. Well, thank you for the presentation, Mr Martin. And we'll hear from Miss Luke and rebuttal. Mhm. In the defendant's, um, brief, the defendant stated that on December the 31st 2016, the reason why plaintiff was terminated was due to a tardy. And that tardy was, um, because Amita Simmons complained to Vicky for that that plaintiff was tardy on that day. And that was the ultimate decision. Why plaintiff was terminated due to the tardy that occurred on December 31st 2016. But, um, in a document document, 54-2 that was sent to the Georgia Department of Labor. The reason stating, um, that Vita Mason stated the final incident occurred on December 31st 2016. Miss Luke did not clock in a mispunch, resulting in the recommendation for termination for failure to follow the attendance policy. The defendant stated that plaintiff was terminated due to a tardy. But the information that was sent to the Georgia Department of Labor stated something totally different, which stated that that that reason, their reason for termination stated in their brief was false. It was two different, two different, um, explanations. Also, Amita Simmons was not listed as a, a witness in the initial disclosure. She was not also listed as a witness in the supplemental disclosure. Um, I didn't find out that information about Amita Simmons until after doing litigation, when that information was sent to me after doing discovery, but they, they did not list her as a witness. So I was not able to, to, um, to answer any questions or do any different dispositions and ask any questions pertaining to, to, um, to anything, um, anything pertaining to my termination. Miss Luke, were you when you became aware of Miss Simmons? Did you, um, object below? Did you ask the trial court for additional time? Did you raise this issue below? I did. I did. Um, I, I told the, um, judge Epps and also that was, I filed a motion in limiting for, um, because they, the, the defendants, um, doing discovery, they were supposed to give me, um, Angela Thomas's time records. They didn't give me that her time records until two weeks prior to, um, this the close of discovery. So I had to find a file emotionally limited to the judge. And he gave me 60 days to get that information to, to, um, to, um, extend discovery and ask questions, um, to Vicky Ford pertaining to Angela Thomas's time records and also about anything pertaining to Amita Simmons. But when I asked the, um, defendants, can I, um, do her disposition? They kept giving me like excuses why she couldn't, why I couldn't, why she couldn't come to those dispositions. All right. Thank you, Miss Luke. I appreciate it. Any, any further questions from my colleagues? Um, well, we appreciate your presentation. Uh, thank you both. And, um, we'll take your case under advisement now, Miss Luke. Thank you. Thank you, Your Honor. Thank you, Mr Martin.